## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**BRYAN E. LAUZON,**                                        Chapter 7
    Debtor                                  Case No. 10-10641-JNF
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**KUN ZHAO AND YING DING,**
    Plaintiffs
v.                                                        Adv. P. No. 10-1114
**BRYAN E. LAUZON,**
    Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

### I. INTRODUCTION

The matter before the Court is the adversary proceeding commenced by the Plaintiffs, Kun Zhao and Ying Ding (the "Plaintiffs" or the "Zhaos") against the Defendant, Bryan E. Lauzon (the "Defendant" or the "Debtor"), a contractor and the former president of a defunct corporation, Pride & Quality Construction, Inc. ("P & Q"). Through their Complaint, the Plaintiffs seek a determination that damages they suffered as a result of contract disputes with the Debtor and P & Q regarding an addition to property located at 19 West Ridge Trail, Plymouth, Massachusetts (the "Property") are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) or (a)(6). In their Complaint, the Plaintiffs alleged their "debt is not dischargeable under 11 U.S.C. § 523(a) [sic] because the defendant Lauzon's actions, as described *supra*, were fraudulent and he converted monies from the plaintiff [sic] by false pretenses, false representations and actual fraud."

1

The Court conducted a trial over the course of three days, commencing on December 5, 2011. At the trial, six witnesses testified and 27 exhibits were introduced into evidence. At the conclusion of the trial, the Court directed the parties to submit briefs by March 9, 2012. The parties complied and filed memoranda. In addition, the Plaintiffs filed a Motion to Amend the Adversary Proceeding Complaint and an Amended Complaint to specifically reference 11 U.S.C. § 523(a)(2)(A) <u>and</u> 523(a)(6). The Debtor filed an Objection. The Court grants the Motion to Amend as the Debtor had notice of the Plaintiffs' claims under both § 523(a)(2)(A) and (a)(6), particularly as the Adversary Proceeding Cover Sheet referenced both subsections of § 523(a).

Upon consideration of the testimony of the witnesses and the exhibits submitted, the Court now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. For the reasons set forth below, the Court shall enter judgment for the Defendant and against the Plaintiffs.

## II. FACTS

On April 30, 2008, the Zhaos, referred to as "Owners," entered into a construction contract for the renovation of, and an addition to, the Property. The Debtor, individually, and as president of P & Q executed the contract. Because he executed the contract in his individual capacity, the Debtor would be personally liable to the Plaintiffs for any damages, if those damages were determined to be nondischargeable under 11 U.S.C. § 523(a)(2)(A) or (a)(6).

The Debtor and P & Q, collectively referred to as "Contractor" were obligated under

2

the terms of the contract to "furnish all of the materials and perform all of the work necessary for a complete renovation and expansion" of the Property. The work was to be performed in accordance with a set of plans furnished by the Plaintiffs. In addition, under the terms of the contract, the Plaintiffs represented that they had obtained a building permit from the Town of Plymouth, although the Debtor agreed to assist them in seeking and obtaining all necessary modifications to the permit as required "to conform said permit to the plans and Specification of the Project." The work to be performed under the contract was to be completed on or before October 30, 2008 and the parties "expressly understood that time . . . [was] . . . of the essence at all times" during the course of their agreement.

The contract price was $529,175, unless there were "additions and deduction hereinafter provided or subsequently agreed to in writing." The Plaintiffs agreed to make progress payments on account pursuant to a Payment Schedule and, in fact, made numerous payments, as will be set forth below. The Zhaos made the payments after the Debtor contacted them and arranged a walk through of the site.

Final payment was due under the contract upon "written notice to Owners that the Contractor's Work is completed." Additionally, the Debtor was to give the Plaintiffs written notice "in the form of waiver of liens from subcontractors." Any disputes arising under the contract were to be submitted "for decision to a private arbitration firm or service which has been approved by the Massachusetts Office of Consumer Affairs and Business Regulation." The Debtor agreed to guaranty his work for a period of one year and to obtain, whenever necessary, warranties for materials, appliances and equipment

furnished.

The parties also agreed that, if the Debtor delayed or refused to prosecute his work with reasonable diligence, failed to comply with any of the terms of the contract or unreasonably delayed completion of the contract, he would be deemed in default, and the Plaintiffs could terminate the contract.  Absent cause for termination, the Plaintiffs agreed to pay the Debtor a fee of 10% of "the amount then remaining to be paid" and "all sums due from special orders that are non refundable, materials and labor outstanding at the time of termination."

The Debtor agreed that in subcontracting any portion of the work under the contract he "would not be relieved from responsibility for the work performed or materials supplied by any subcontractor" and that he would be "bound by the terms of this Contract notwithstanding any such subcontract."  Additionally, he agreed to "properly direct and control any subcontractors, being responsible for the coordination of the Contractor's work and any subcontractor's work."  Finally the parties agreed to the following:

> If Owners or their architect change materials to be used or items to be installed (such as air conditioning unit, fixtures, toilets, faucets, etcetera-by way of illustration and not limited thereto) both cost and time of Completion of Contract date may be impacted.

> If new items or materials cost more, the Owners will pay the difference between the original item or material and the new item or material. In addition, if old item or material is special order [sic] that required a non refundable cost to the Contractor then that amount too will be added to the cost of this Contract.

> The Contractor will notify the Owners and architect, as to the additional time and cost prior to ordering same and will state if said change in item or

4

material will result in a delay as to the Completion Date.

As noted above, the Zhaos made progress payments pursuant to the terms of the contract.  The following table summarizes the value ascribed by the Debtor to significant benchmarks under the contract and payments made by the Zhaos.

| Scope of Work/ Materials Furnished | Progress Payment Due | Amt. Paid | Date | Check # | Explanation |
|---|---|---|---|---|---|
| Deposit | $10,000 | $10,000 | 4/29/08 | 135 | |
| Foundations (as build required) | $48,453 | $24,226.50 $24,226.50 | 6/11/08 6/25/08 | 137 106 | Ck. #106 in the amount of $26,726.50 contained an additional $2,500 attributable to a change order (Ex. 11) |
| Framing | $51,453 | $51,453 | 8/5/08 | 108 | Ck. #108 in the amt. of $60,000 contained an additional $8,547 attributable to a change order not in evidence |
| Sheathing | $30,650 | $30,650 | 7/26/08 | 107 | Ch. #107 in the amt. of $52,895.03 contained an additional $22,245.03 attributable to a change order (Ex. 15) |
| Roof Boarding | $9,980 | $9,980 | 8/29/08 | 139 | Ch. #139 in the amt. of $58,008.15  also was applied to Roof shingles and Rough Plumbing, as well as a change order not in evidence |
| Roof Shingles | $9,980 | $9,980 | 8/29/08 | 139 | |

5

| Exterior Doors & Windows | $30,890 | $30,890 | 9/18/08 | 140 | Ck. # 140 in the amt. of $58,710 also was applied to Chimney & Fireplace and Rough Heat & AC |
|---|---|---|---|---|---|
| Exterior siding installed | $22,770 | $22,770 | 11/10/08 | 142 | Ck. #142 satisfied this payment and ½ of Interior &Exterior Painting |
| Interior & Exterior Painting | $22,770 | $10,000 | 11/10/08 | 142 | |
| Chimney & Fireplace | $4,045 | $4,045 | 9/18/08 | 140 | |
| Rough Plumbing (sign off required) | $24,840 | $24,840 | 8/29/08 | 139 | |
| Rough Electric (sign off required) | $16,490 | $16,490 | 12/2/08 | 143 | |
| Rough Heat & AC | $23,775 | | | | |
| Sewer/Septic (certificate of compliance) | $0 | | | | |
| Water | $0 | | | | |
| Insulation (sign off required) | $11,595 | | | | |
| Drywall/Plaster | $24,870 | | | | |
| Interior Doors | $7,700 | | | | |
| Interior Finish (woodwork) | $16,980 | | | | |
| Finish Plumbing (sign off required) | $5,850 | | | | |
| Finish Electric (sign off required) | $5,850 | | | | |
| Finish Heat & AC | $4,240 | | | | |
| Finish Floor (cellar including garage) | $8,526 | | | | |
| Finish Floor (bath & kitchen) | $7,780 | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Finish Floor (hardwood, carpet) | $24,220 | | | | |
| Kitchen Cabinets (including countertop) | $35,950 | | | | |
| Appliances | $8,500 | | | | |
| Steps & Deck (porch) | $24,255 | | | | |
| Contingency & holdback/ occupancy | $26,461 | | | | |
| Paving driveway | $10,301 | | | | |
| **Total** | **$529,175** | **$293,326** | | | |
| Allowances | | | | | |
| Flooring | $32,000 | | | | |
| Lighting | $5,500 | | | | |
| Kitchen, countertops, vanities | $35950 | | | | |
| Appliances | $8,500 | | | | |
| Landscaping | $12,500 | | | | |

The parties agreed to a number of change orders as the job progressed. The Plaintiffs submitted checks establishing that they paid $85,610.06[1] for work outside the scope of the original project set forth in the Payment Schedule. The Plaintiffs, however, introduced change orders as exhibits reflecting only a portion of that total, i.e, $24,745.03. The balance of the work attributable to change orders, including a work order dated

---

[1] The Plaintiffs submitted a chart with the amounts of the change orders totaling $85,740.86. The Court ascertained discrepancies between the amount of the change order dated August 8, 2008 ($13,339.15), which was not submitted into evidence, and the balance of check #139 attributable to that change order ($13,208.35), as well as a transcription error for check #141. Thus, the Court's calculation of the total amount of change orders is $85,610.06

September 13, 2008 for various items, including kitchen cabinets and window hardware totaling $22,850.29, was unsupported by an exhibit introduced into evidence. Because of Ms. Ding's testimony and the Debtor's acceptance of checks attributable to all the change orders, the Court finds that the parties agreed to modify the contract and change the original contract price of $529,175, through various change orders, including a change order in the sum of $22,850.29. The Plaintiffs paid for the following change orders in advance.

| Date of change order | Description of Work | Amount | Date Paid | Check # |
|---|---|---|---|---|
| 5/21/08 | new foundation, permits | $7,639.39 | 5/20/08 | 1604 |
| 6/24/08 | new slab | $2,500 | 6/25/08 | 106 |
| 7/26/08 | windows/exterior doors | $22,245.03 | 7/26/08 | 107 |
| 8/5/08 | framing | $8,547 | 8/5/08 | 108 |
| 8/8/08 | upgrade sliders, AC condensers | $13,208.15 | 8/24/08 | 139 |
| 9/13/08 | kitchen cabinets, window hardware[2] | $22,850.49 | 9/17/08 | 141 |
| 12/13/08 | painting, electrical | $5,675 | 12/13/08 | 1028 |
| 12/14/08 | electrical | $2,945 | 12/14/08 | 1029 |

Although the above chart would suggest change orders totaled $85,610.06, the Plymouth District Court, in a civil action commenced by One Stop Painting & Renovation, Inc. against P & Q and the Plaintiffs, determined that the new contract price, inclusive of change orders, was $579,449.36. It also determined that P & Q retained $142,378.45 or 38%

---

[2] The change order dated September 13, 2008 referenced an "overage on kitchen allowance (hardware not included) in the sum of $9,984 and "Interior hardware doors, gliders and windows" in the sum of $5,654.99.

8

of the $378,936.06 paid by the Zhaos to the Debtor.

The project was plagued with problems and delays from the outset as the plans obtained by the Plaintiffs were inaccurate or insufficient in certain respects, requiring alterations to the scope of the work.  The Debtor testified that the foundation was inadequate to support the new addition and that there were mistakes in the specifications as to ceiling heights.  In addition, the Plaintiffs selected siding from National Lumber and obtained a siding sample.  When the siding was delivered to the job site, the parties discovered that the siding delivered was inferior to the siding which the Plaintiffs selected. The Debtor and the Plaintiffs agreed in mid to late October of 2008 that "[s]iding would be picked through to avoid larger knots as was applied to the back side of house." They also agreed that the siding was to match what had been installed at the front of the garage with larger knots to be cut out or discarded.  They recognized that "culling the product both before and during install [sic] will require considerable more time to finish the siding while achieving the desired look."  The Debtor did not charge the Zhaos for the change but set forth in a change order, which was signed by the Zhaos, that additional time would be needed to complete the project and that the painting subcontractor would need to be rescheduled.

Ms. Ding testified about a  purported deposit for kitchen cabinets which were to be purchased from Kitchen Sales, Inc., as well as a deposit for interior hardware.  She testified that the Debtor demanded the deposits but did not deliver the monies obtained from the Zhaos to Kitchens Sales, Inc.   She stated:

He bring us to the store [Kitchen Sales, Inc.] to introduce the person and the person asked us to pick up [sic] the kitchen cabinet and that's it.  And then later Bryan tell us totally how much we paid and he said it's  - - must have paid 50 percent deposit.  They started to go high - -to make the cabinet, so we paid it.

Ms. Ding further testified that the Plaintiffs paid the deposit to the Debtor  but after the contract was terminated they were required to pay Kitchen Sales, Inc. $24,000 with no credit for the deposit of $9,984.

The Debtor testified that it was his belief that the hardware in question had been delivered to the Property and was stored in a crawl space above the garage.  With respect to the kitchen cabinets, he testified that he had a line of credit with Kitchen Sales, Inc. and, therefore, did not need to provide it with a deposit, adding that the sum of money for cabinets that was part of the Zhaos' check in the sum of $22,850.29 was attributable to an overage on the kitchen allowance.  Indeed, the unsigned change order supports that interpretation.

The Debtor engaged a number of subcontractors to perform work at the Plaintiffs' Property. Several were not paid in full.  The Zhaos learned in January of 2009 that National Lumber Company had placed or intended to place a lien on their home.[3]  They had financed a portion of the project cost with South Coastal Bank, which informed them of the lien.  It refused to release additional funds to the Zhaos as a result.

The Debtor and the Zhaos met at the Property on February 1, 2009.  The Debtor was accompanied by Jonathan Graham, Esq., an attorney whom the Debtor identified as a

---

[3]The lien was recorded on February 20, 2009.

friend.  The Debtor was evasive as to the reasons why Attorney Graham attended the

meeting.  He initially testified that the lawyer joined him to "see what we were doing on

this house," but later admitted that he was there so "there would be no misconstruing what

was said."  The Debtor had recognized that he was in financial difficulty and had prepared

an audit of the project.   The Debtor's audit, which was submitted as an exhibit, is

reproduced, in pertinent part, below:

| | |
|---|---|
| Total Deposits to Date | $378,936.06 |
| | |
| Total Expenditures to Date | $337,784.75 |
| Dump | $1,600.00 |
| Dumpsters (C.L. Noonan) | $5,280.00 |
| Roof Labor | $5,200.00 |
| Slab Floors | $5,840.00 |
| Electrical | $15,225.00 |
| Kingston Block | $3,229.00 |
| Framing M.C. | $32,500.00 |
| Manns Heating AC | $24,000.00 |
| Pastore Concrete | $17,089.00 |
| Patriot Plumbing | $19,060.00 |
| One Stop Painting | $24,900.00 |
| National Lumber | $43,411.36 |
| Plastering | $16,000.00 |
| Cape Cod Concrete cutting | $650.00 |
| Churchill Engineering | $1,850.00 |
| Winslow plumbing (central vac) | $2,400.00 |
| All State Garage Door | $6,800.00 |
| SRW Rubber Roof | $1,342.80 |
| SRW | $188.00 |
| Kingston Block | $288.59 |
| Chimney inside | $2,500.00 |
| Home Depot | $6,492.00 |
| Pride & Quality Labor | $102,170.00 |
| | |
| Total Difference | $41,208.45 |

11

Overhead for business is $12,000.00 per/month in expenses.
This job has gone 9 months so far at a cost of $108,000.00 of which $41,208.45
was covered leaving Pride & Quality with a deficit of $66,791.55+

| | |
|---|---|
| Remaining payments total | $214,552.00[4] |
| Work already completed | $40,705.00 |
| Remaining Contract to be billed | $173,847.00 |

Subs Owed (outstanding)

| | |
|---|---|
| One Stop Painting | $2,900.00 |
| Andrews Insulation [sic] | $25,000.00 |
| Buffington Plasterer | $3,900.00 |
| Mann's Heating | $8,500.00-$12,000.00 |
| National Lumber | $80,000.00 |

The total sums owed to subcontractors and suppliers, according to the Debtor, was between $120,300 and $123,800. The Debtor included estimated additional costs to complete the project that ranged from $120,000 to $140,000. The only cost that was not considered, either over the budgeted cost or an additional cost, was a $12,500 expense for landscaping which was part of an allowance under the contract.

The Debtor testified that he had hoped to reach an agreement with the Plaintiffs about finishing the job. He recognized that National Lumber, Inc. had to be paid and proposed to pay it from the $40,705 owed and the $26,461 retainage under the contract.

Ms. Ding viewed the results of the meeting very differently. She testified that the Debtor, in effect, attempted to extract an additional $120,000 - $140,000 from the Plaintiffs to complete the contract and threatened to file a bankruptcy petition if they did not agree

---

[4] In terms of the progress payments, the Plaintiffs would appear to have owed the Debtor $259,623 under the existing contract, without considering change orders.

to the increased costs.  Ms. Ding testified about what the Debtor said.  In her words, he

stated: "'You never finish the house and you fail [sic] pay big money to lawyer and remove

the lien.'" Following conversations with their bank and friends, Ms. Ding testified that the

Plaintiffs came to the conclusion that they had been robbed and did not owe the Debtor a

penny.   On February 7, 2009, they changed the locks on the Property, effectively

terminating the contract.   The Debtor, testified, however, that he did not threaten

bankruptcy and continued working on the exterior of the property for several weeks after

the February 1, 2009 meeting.

Notably, neither the Debtor nor the Plaintiffs submitted detailed evidence as to the

status of the project in mid-February 2009 when the contract was terminated, although the

Debtor estimated that approximately 25% of the job was left to be finished, adding that he

had credit lines with Mid-Cape Home Centers and Sampson Lumber.  The Zhaos had paid

the Debtor $378,936.06 and subcontractors were owed at least $120,300, including $25,000

to Andrews Insulation [sic].[5]  In view of the contract price of $597,449.36 determined by the

Plymouth District Court, the sums paid by the Zhaos ($378,936.06) and the amount owed

subcontractors and suppliers ($120,300), there were still monies due under the contract,

approximately $89,000, which could have been used to complete the project, depending

upon the scope of the work remaining and the Debtor's intent to complete the project. The

Debtor testified:

---

[5] The accuracy of the Debtor's summary is doubtful.  Anderson Insulation, Inc.'s
statement of account indicated that it was owed $23,460.

13

The job could have been completed with what monies were owed and other monies owed to Pride & Quality through the -- couple of other sources with the possibility of maybe a payment plan with one of my subs but, I mean, it was very close. It could have been with no change, further changes. There could have been enough money in the contract to finish it as per the plans originally.

On March 3, 2009, the Plaintiffs' attorney, Joseph K. Curran, Jr., notified the Debtor that he and P & Q were in default of the terms of the contract and that the letter was to serve as "notice of your termination from the project effective immediately." Additionally, he informed the Debtor of the Plaintiffs' intention to seek damages under Mass. Gen. Laws ch. 93A.

When the Debtor was approached by his suppliers and subcontractors about payment of their outstanding invoices, the Debtor testified that he advised them to put liens on his home and the Plaintiffs' Property. Several subcontractors heeded his advice. Excluding National Lumber Company, with a lien in the sum of $82,041.35, Mann's Heating & Air Conditioning, LLC placed a $16,000 lien on the Property, One Stop Painting & Renovating, Inc. placed a $5,871.32 lien on the Property, and Anderson Insulation, Inc. recorded a $23,460 lien on the Property.

In the Plymouth District Court action commenced by One Stop Painting and Renovating, Inc., the state court determined that "Pride did not pay its subcontractors, but instead opted to retain much of the money as profit or for expenses it was not then entitled to," adding "Zhao had a reasonable expectation of paying for those services and did, in fact, pay Pride for those services."

As noted above, the state court found that P & Q retained $141,378.45 of the monies

paid by the Plaintiffs.  The Debtor's bank records fpr  P & Q from January of 2009 establish

that the Debtor took $70,940 out of the P & Q bank account at Bridgewater Savings Bank

in one month alone.  Nevertheless, the Debtor testified he deposited other monies in P &

Q's bank account, and his bank records establish that on January 9, 2009, he deposited a

check made payable to P & Q in the sum of $60,000 from 10 Brothers Lane, LLC.  The Court

infers that the Debtor obtained funds from P & Q to assist the Boarderland Realty Trust or

10 Brothers Lane, LLC in their business of buying, improving and flipping residential

properties, located at 18 Priscilla Mullins Way, Carver, Massachusetts and 10 Brothers

Lane, Harwich, Massachusetts, respectively.  Nevertheless, the Debtor also deposited

money from those entities into P & Q's bank account.

## III. DISCUSSION

A. Section 523(a)(2)(A)

1. Applicable Law

Section 523(a)(2)(A) excepts from discharge a debt of an individual debtor "for

money, property, services, or an extension, renewal, or refinancing of credit, to the extent

obtained, by — (A) false pretenses, a false representation, or actual fraud, other than a

statement respecting the debtor's or an insider's financial condition." 11 U.S.C. §

523(a)(2)(A). The plaintiff must establish that the debt is excepted from discharge by a

preponderance of the evidence. *See* Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 112

L.Ed.2d 755 (1991).

15

In <u>Blacksmith Invs., LLC v. Woodford (In re Woodford)</u>, 403 B.R. 177

(Bankr.D.Mass.2009), *aff'd*, 418 B.R. 644 (B.A.P. 1st Cir. 2009), this Court stated:

> The United States Court of Appeals for the First Circuit has addressed issues under section 523(a)(2)(A) on multiple occasions, observing that, as with all exceptions to discharge under section 523(a), they are "narrowly construed . . . and the claimant must show that its claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." <u>McCrory v. Spigel (In re Spigel)</u>, 260 F.3d 27, 32 (1st Cir. 2001) (citing <u>Century 21 Balfour Real Estate v. Menna (In re Menna)</u>, 16 F.3d 7, 9 (1st Cir.1994)). In <u>Spigel</u>, the First Circuit, while noting that the Supreme Court overruled its formulation of the reliance element of the test for nondischargeability under section 523(a)(2)(A), articulated the following requirements for establishing an exception to discharge under section 523(a)(2)(A):
>
>> [W]e have said that the statutory language does not "remotely suggest that nondischargeability attaches to any claim other than one which arises as a direct result of the debtor's misrepresentations or malice." <u>Century 21 Balfour Real Estate</u>, 16 F.3d at 10. Thus, in order to establish that a debt is nondischargeable because obtained by "false pretenses, a false representation, or actual fraud," we have held that a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage. <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 786 (1st Cir. 1997). Though the first two elements of the <u>Palmacci</u> test describe the conduct and scienter required to show fraudulent conduct generally, the last four embody the requirement that the claim of the creditor arguing nondischargeability in an adversary proceeding must arise as a direct result of the debtor's fraud.
>
> <u>Spigel</u>, 260 F.3d at 32 (footnotes omitted).

<u>In re Woodford</u>, 403 B.R. at 183–84 (footnote omitted). *See also* <u>Liddell v. Peckham (In re</u>

Peckham), 442 B.R. 62, 73 (Bankr. D. Mass. 2010).

In Youssef v. Fogarty (In re Fogarty), No. 08–1112, 2010 WL 916818 (Bankr. D. Mass. Mar.10, 2010), this Court discussed McClellan v. Cantrell, 217 F.3d 890 (7th Cir. 2000), and its progeny, in which courts hold that "actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions. . . . [w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right. . . ." See Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001); K–B Building Co. v. Barber (In re Barber), 281 B.R. 617, 624 (Bankr. W.D. Pa. 2002); and Gentry v. Kovler (In re Kovler), 249 B.R. 238, 260–61 (Bankr. S.D.N.Y. 2000). This Court stated:

> While the First Circuit has focused its test on the "false representation" component of section 523(a)(2)(A), and the Seventh Circuit formulated a different approach for the "actual fraud" component, other courts have fashioned a slightly different test for the "false pretenses" component. For example, in Ostertag v. Overall (In re Overall), 248 B.R. 146 (Bankr. W.D. Mo. 2000), the court observed:
>
>> The concept of false pretenses is especially broad. It includes any intentional fraud or deceit practiced by whatever method in whatever manner. False pretenses "may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts intended to deceive." Black's Law Dictionary 602 (6th ed. 1990). It is a "series of events, activities, or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongly induced by a debtor to transfer property or extend credit to the debtor." Sterna v. Paneras (In re Paneras), 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996). Silence or concealment as to a material fact can constitute false pretenses. Bank of Miami v. Quintana (In re Quintana), 4 B.R. 508, 510 (Bankr. S.D. Fla. 1980). In short, false

17

pretenses "can be made in any of the ways in which ideas can be communicated." First Nat. Bank of Webster v. Aetna Cas. & Sur. Co., 256 F.Supp. 266, 272 (D. Mass.1966).

In re Overall, 248 B.R. at 150 (footnote omitted).

In re Fogarty, 2010 WL 916818 at *7–*8.

The Plaintiffs maintain that the Debtor falsely represented to them that a deposit of 50% was required before Kitchens Sales, Inc. would order cabinets and that a deposit of $5,654.99 was required to purchase interior hardware. They assert that, when the Debtor demanded the two deposits in September of 2008, the Debtor had no intention of using the money to pay his material suppliers. They maintain that they were forced to pay an additional $24,000 for kitchen cabinets and an additional $2,677 for hardware, although they did not submit evidence in the form of canceled checks. With respect to the kitchen cabinets in particular, the Plaintiffs did not submit evidence of how much they actually spent on kitchen cabinets. Accordingly, it is unclear whether they paid $24,000 plus $9,984 or some additional amount. In view of the $35,950 allocated to the kitchen and countertops in the original contract, the Court finds that the Zhoas failed in the burden of proof as to damages.

More importantly, in view of the way the contract was drafted, the Court finds that the Plaintiffs failed to establish that the Debtor made false representations with intent to deceive as the Payment Schedule did not earmark payments for particular tasks and materials. Although the Debtor was involved in "flipping" houses, the Plaintiffs failed to establish that he had no intention of acquiring and installing the cabinets or the hardware.

18

Indeed, the Debtor credibly testified as to his desire to complete the project and attempted to do so on the exterior of the Property even after the Plaintiffs changed the locks. Additionally, the Debtor was of the opinion the hardware had in fact been delivered to the site. Accordingly, the Court finds that the Plaintiffs failed in their burden of proof with respect to critical elements of a cause of action under § 523(a)(2)(A).

B.  Section 523(a)(6)

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). As under 11 U.S.C. § 523(a)(2), the Plaintiff bears the burden of proving his claim under § 523(a)(6) by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In Kawaauhau v. Geiger, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), the Supreme Court analyzed the "willful" component of section 523(a)(6). It stated:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964) (emphasis added).

523 U.S. at 61–62, 118 S.Ct. 974. As a result of the Supreme Court's decision, actions of the

19

debtor which simply cause injury, but which are not deliberately undertaken, are not

excepted from discharge.  Because the Supreme Court found that the defendant's medical

malpractice did not rise to the level of willful injury, the Court did not reach the question

of what the term "malicious" added to the analysis. Id.

The United States Court of Appeals for the First Circuit in Printy v. Dean Witter

Reynolds, Inc., 110 F.3d 853 (1st Cir.1997), held that the element of malice in section

523(a)(6) requires that the creditor show that the willful injury was caused without

justification or excuse, adding that "personal hatred, spite or ill-will" need not be

established to find the element of malice. Id. at 859. The Printy formulation is followed by

bankruptcy courts in this circuit. See, e.g., In re Peckham, 442 B.R. at 78  (citing Hermosilla

v. Hermosilla (In re Hermosilla), 430 B.R. 13, 22 (Bankr. D. Mass. 2010); Bauer v. Colokathis,

417 B.R. 150, 158 (Bankr. D. Mass.2009); Caci v. Brink (In re Brink), 333 B.R. 560, 567 (Bankr.

D. Mass. 2005); Gomes v. Limieux (In re Limieux), 306 B.R. 433, 440 (Bankr. D. Mass. 2004);

and McAlister v. Slosberg (In re Slosberg), 225 B.R. 9, 21 (Bankr. D. Maine 1998).

In Colokathis, this Court stated:

Construing Geiger and Printy, together this Court concludes that, for an
exception to discharge under 11 U.S.C. § 523(a)(6) to apply, the creditor has
the burden of showing . . . that 1) the creditor suffered injury; 2) the debtor
intended to cause the injury or that there was substantial certainty that the
injury would occur; and 3) the debtor had no justification or excuse for the
action resulting in injury. This is consistent with the Slosberg court's view
that although "the terms [willful and malicious] might share elements, i.e.,
they both require that the act itself be intentional, they must have
independent significance. In re Geiger should not be read to collapse the two
elements into one." Slosberg, 225 B.R. at 19–20 (citations omitted).

<u>Colokathis</u>, 417 B.R. at 157–58. *See also* <u>Hermosilla v. Hermosilla (In re Hermosilla)</u>, 430 B.R.

13, 22 (Bankr. D. Mass. 2010).

Despite the interpretation of malice in the First Circuit and elsewhere, the law

remains unsettled. For example, in <u>GMAC, Inc. v. Coley (In re Coley)</u>, 433 B.R. 476 (Bankr.

E.D. Pa. 2010), the court stated:

> Courts also have invoked different standards for determining whether an
> intentional tort involved "malice" within the meaning of § 523(a)(6). For
> example in <u>In re Long</u>, 774 F.2d 875, 881 (8th Cir.1985), the court reasoned
> that, for the debt for any injury arising from an intentional tort to be
> nondischargeable under § 523(a)(6), the debtor's conduct must be "more
> culpable than that which is in reckless disregard of creditors' economic
> interests and expectancies." Further, in assessing the debtor's culpability,
> "knowledge that legal rights are being violated is insufficient to establish
> malice, absent some additional 'aggravated circumstances'. . ." <u>Id.</u> Other
> courts, too, have stated that the existence of "aggravating circumstances" and
> a conscious disregard of one's societal duties to others are essential aspects
> of the malice requirement under § 523(a)(6). *See, e.g.*, <u>In re Logue</u>, 294 B.R. 59,
> 63 (B.A.P. 8th Cir. 2003); <u>In re Richardson</u>, 2007 WL 2381990, at *6–7 (Bankr.
> N.D. Ala. Aug.17, 2007); <u>In re Wieser</u>, 2007 WL 4868319, at *2 (Bankr..D. N.D.
> 2007); <u>In re Hambley</u>, 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005); <u>In re
> Blankfort</u>, 217 B.R. 138, 143–45 (Bankr. S.D.N.Y. 1998).

> In this unsettled area of the law, one court has summarized the differing
> standards for malice as follows:

>> One standard requires proof from the creditor that the debtor
>> acted with the specific intent to injure the creditor. A second
>> view is that the creditor need only prove that the debtor acted
>> without just cause or excuse. A third approach requires that
>> the debtor's conduct target the creditor, at least in the sense
>> that the conduct was certain or almost certain to cause financial
>> harm. A fourth approach, which has been characterized as a
>> "totality of the circumstances" approach, adopts the position
>> that an injury is malicious if the debtor fails to act in subjective
>> good faith.

In re Pineau, 149 B.R. 239, 242 (D.Me.1993) (emphasis added) (citing In re Horldt, 86 B.R. 823 (Bankr.E.D.Pa.1988)).

In re Coley, 433 B.R. at 499-500 (footnote omitted).

The Zhaos maintain that the Debtor converted their money to advance real estate flipping businesses in which he had interests. In addition, they assert that he converted their monies to pay all of the carrying costs for the Harwich and Priscilla Mullens Way properties. They also curiously assert that he intended to harm P & Q, which had sufficient income from monies paid by the Zhaos to pay the subcontractors and material suppliers. The Plaintiffs argue that the Debtor converted P & Q's assets for his personal use and placed its assets out of the reach of creditors, adding that he intended to harm them when he advised subcontractors to place liens on the Property.

In Gadtke v. Bren (In re Bren), 284 B.R. 681 (Bankr. D. Minn. 2002), a case involving a construction contract, the court observed that the plaintiffs, the Gadtkes, argued that the debt of a construction contractor to them was nondischargeable under 11 U.S.C. § 523(a)(6). Finding that the plaintiffs were required to establish that the debtor intended both the injury and the harm, 284 B.R. at 699 (citations omitted), the court observed:

> The Gadtkes argue that Bren's conduct amounts to a willful and malicious conversion of their property, because Bren procured their funds under the pretense of applying them toward the construction of the Gadtkes home, yet knowingly and willfully misapplied those funds to pay general debts of BBHI. As I found earlier, once the Gadtkes paid Bren the payments due under the contract, that money no longer belonged to them but became Bren's property. *See* In re Belfry, 862 F.2d at 662. A person cannot convert his own property.
>
> For the Gadtkes to prevail on the § 523(a)(6) claim, they must demonstrate

22

> that they suffered an injury as a result of an intentional tort by Bren (i.e. that
> Bren's actions were willful) and that Bren's conduct was targeted at the
> Gadtkes (i.e. Bren's conduct was also malicious). I find that Bren did not
> intend to injure or harm the Gadtkes. It is obvious both from testimony and
> his actions that Bren had every intention of paying subcontractors and
> performing under the contract. In hindsight, one may characterize Bren's
> actions as negligent but his actions were not intentional. I also find that Bren
> did not act with maliciousness in that his actions were not targeted to cause
> harm to the Gadtkes.

Id. The same logic pertains in the instant case. Although the Debtor had other business

interests and he used monies obtained from the Zhaos to advance those interests, the Court

lacks evidence that he intended to willfully and maliciously injure the Zhaos. The progress

payments required under the contract were not expressly earmarked for particular

purposes or subcontracts, and there was profit built into the schedule of payments attached

to the contract that was not delineated. The Debtor's failure to pay some of the

subcontractors who worked on the Property at the time he was paid by the Zhaos does not

preclude a valid intention to eventually pay those subcontractors either from future

progress payments or from profits from the job or profits from the sale of the properties

owned by the Boarderland Realty Trust or 10 Brothers Lane, LLC. The Debtor had lines

of credit with various suppliers so conceivably he could have finished the project. While

the Debtor used the progress payments from the Zhaos to pay himself or his workers on

other projects, the Plaintiffs failed to prove by a preponderance of the evidence that he

lacked the subjective intent to pay subcontractors and material suppliers at the time he

received the progress payments. The Debtor's audit of the project established that there

were monies available to do substantial work on the Property even after the payment of

subcontractors.  The Zhaos also failed to submit cogent evidence of their damages.  In particular, they failed to submit any evidence of the amount of money they spent in addition to the $378,936.06 paid to the Debtor, except for Ms. Ding's testimony that the were required to spend approximately $35,000 to acquire kitchen cabinets and an additional sum of less than $5,000 for hardware.


## IV. CONCLUSION

Based upon the evidence presented, the Court finds that the Debtor breached his contract with the Zhaos by not paying his subcontractors in accordance with the parties' contract dated April 30, 2008.  Additionally, he may have been found to have engaged in practices that violated Mass. Gen. Laws ch. 93A.  The Debtor's conduct, however, did not rise to the level that would permit this Court to find that his debt in an unspecified amount is nondischargeable under either 11 U.S.C. § 523(a)(2)(A) or (a)(6).  In view of the foregoing, the Court shall enter judgment in favor of the Defendant and against the Plaintiffs.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  April  9, 2012

24